Slip Op. 11–45

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SHANDONG RONGXIN IMPORT & EXPORT CO., LTD., <br><br>                   Plaintiff, <br><br>       v. <br><br> UNITED STATES, <br><br>                   Defendant. | **Before: Gregory W. Carman, Judge** <br><br> Court No.  09-00316 |

[*Remand results sustained in part and remanded in part*]

deKieffer & Horgan (John J. Kenkel, James K. Horgan, Gregory S. Menegaz), for Plaintiff.

Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Carrie A. Dunsmore); Daniel J. Calhoun, International Office of the Chief Counsel for Import Administration, Department of Commerce, of counsel, for Defendant.

April 21, 2011

### OPINION & ORDER

CARMAN, JUDGE: This action is before the Court following the final results of

redetermination pursuant to remand ("Remand Results"), filed by the Department of

Commerce ("Commerce") on December 20, 2010.  (ECF No. 43.)  Plaintiff Shandong

Rongxin Import & Export Company ("Shandong") challenges the Remand Results only

with respect to the value Commerce assigned to the wage rate factor of production in

constructing the normal value of the subject merchandise.  (Pl.'s Cmts. on Final Results

of Redetermination Pursuant to Remand ("Pl.'s Cmts.") at 1.)  For the reasons set forth

below, the Remand Results are sustained in part and remanded in part.

## BACKGROUND

In China First Pencil Co. v. United States, 34 CIT __, 721 F. Supp. 2d 1369 (2010),

the Court sustained-in-part and remanded-in-part Commerce's final determination in

the 2006-2007 administrative review of the antidumping duty order on Certain Cased

Pencils from the People's Republic of China ("PRC").  The above captioned case was

consolidated with China First shortly before the Court issued its opinion; after

Commerce issued the Remand Results, Shandong was the only party seeking to

challenge the Remand Results.  Accordingly, the Court severed the cases and issued a

judgment in China First Pencil Co. v. United States, Court No. 09-00325.  Shandong now

proceeds on its own.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a)(2)

and 28 U.S.C. § 1581(c).[1]  By statute, when reviewing Commerce's determination, the

Court "shall hold unlawful any determination, finding, or conclusion found . . . to be

---

[1] All citations to the United States Code refer to the 2006 edition.

unsupported by substantial evidence on the record, or otherwise not in accordance with

law."  19 U.S.C. § 1516a(b)(1)(B)(i); <u>see</u> <u>also</u> <u>China First</u>, 721 F. Supp. 2d at 1372.

DISCUSSION

In determining the dumping margin in this case, Commerce calculated the

normal value of the subject merchandise on the basis of the values of certain factors of

production in "a market economy country or countries considered to be appropriate by

[Commerce]."  19 U.S.C. § 1677b(c)(1).  The purpose of this statute is "to assess the price

or costs of factors of production of [the subject merchandise in a surrogate market

economy country,] in an attempt to construct a hypothetical market value of that

product in [the nonmarket economy country]."  <u>Nation Ford Chem. Co. v. United</u>

<u>States</u>, 166 F.3d 1373, 1375 (Fed. Cir. 1999) (internal quotations omitted).  In deciding

how to appropriately value factors of production, Commerce is required to "utilize, to

the extent possible, the prices or costs of factors of production in one or more market

economy countries that are—(A) at a level of economic development comparable to that

of the nonmarket economy country, and (B) significant producers of comparable

merchandise."  19 U.S.C. § 1677b(c)(4).  When Commerce elects to calculate normal

value pursuant to this method, one of the factors of production for which it must

establish a value is labor, or the wage rate.  19 U.S.C. § 1677b(c)(3).

In <u>Dorbest Ltd. v. United States</u>, 604 F.3d 1363, 1372 (Fed. Cir. 2010), the Court of

Appeals for the Federal Circuit ("CAFC") invalidated the regulation in which

Commerce had established its preferred method for valuing labor as a factor of

production.  The CAFC held that the agency's regression-based methodology produced

a value for labor that failed to utilize data only from countries that are at a level of

economic development comparable to that of the nonmarket economy country, and that

are significant producers of comparable merchandise, as required by 19 U.S.C.

§ 1677b(c)(4).  See id.  Because the final determination challenged in China First was

issued prior to the CAFC decision in Dorbest, the Court remanded this case to

Commerce with instructions to "adjust the surrogate value for labor to conform with

the statutory requirements [of 19 U.S.C. § 1677b(c)(4)], as explained in Dorbest."  China

First, 721 F. Supp. 2d at 1382.  The value Commerce subsequently assigned to the wage

rate is the only aspect of the Remand Results presently challenged by Shandong.

A.      Commerce's Wage Rate Determination on Remand

As a threshold matter, Commerce determined that when valuing labor as a factor

of production, data from several countries is preferable to data from a single country.

While the agency normally values most other factors of production by using figures

from a single surrogate country, Commerce continues to find, as it did before the CAFC

invalidated its regression-based analysis in Dorbest, that labor is different.  Remand

Results at 10-11; see also 19 C.F.R. § 351.408(c)(2).  According to Commerce, labor is

distinguished from other factors of production because it demonstrates wide variability,

even between countries with similar gross national income per capita ("GNI").  Remand

Results at 10.  Commerce justifies this view by citing "many socio-economic, political

and institutional factors, such as labor laws and policies unrelated to the size or strength

of an economy, that cause significant variances in wage levels between countries," and

by noting that "labor is not traded internationally."  Id. at 11 (citing International Labor

Organization, Global Wage Report: 2009 Update, at 5, 7 and 10 (2009), available at

http://www.ilo.org/wcmsp5/groups/public/@dgreports/@dcomm/documents/

publication/wcms_116500.pdf (last visited April 21, 2011).)  Accordingly, Commerce

valued labor by calculating a simple average of certain specific wage rate data from the

group of countries the agency determined to be both economically comparable to the

PRC and significant producers of comparable merchandise.  Id.; see also Remand

Determination of 2006-2007 Administrative Review of the Antidumping Duty Order on

Certain Cased Pencils from the People's Republic of China: Industry-Specific Wage Rate

Selection ("Wage Rate Memo"), October 13, 2010 (AR 2707) at 4–5.

     1.    Economic Comparability

     To identify which countries are at a level of economic development comparable

to the PRC, Commerce began with the Surrogate Country Memo, in which it had

identified five countries as potential surrogates from which the agency would be able to

derive values for all the other factors of production, besides labor.  <u>Wage Rate Memo</u> at

2.  Commerce ranked the five countries in order of ascending GNI: India, the

Philippines, Indonesia, Colombia, and Thailand.  <u>Id.</u>  Using the lowest-GNI country

(India) and highest-GNI country (Thailand) as "bookends," Commerce turned to the

World Bank's 2009 World Development Report to identify every country with a GNI

between the two, thus establishing the first and broadest basket of countries—44 that

the agency deemed to be economically comparable to the PRC.  <u>Id.</u>; <u>see</u> <u>also</u> <u>id.</u> at

Attach. 2.

        2.      <u>Significant Producers of Comparable Merchandise</u>

Commerce then determined which of these 44 countries were significant

producers of comparable merchandise by identifying every country that exported any

quantity of comparable merchandise (defined as exports under HTS 9609.10.00)

between 2005 and 2007.  <u>Id.</u> at 3.  This produced a narrower basket of countries—30

that, in the agency's view, satisfy the dual requirements of 19 U.S.C. § 1677b(c)(4).  <u>Id.</u>;

<u>see</u> <u>also</u> <u>id.</u> at Attach. 2.

        3.      <u>Selecting and Sorting Reliable Wage Data</u>

The next step in Commerce's process was to assess which of these 30 countries

had made available adequate data that could be averaged together to produce a single

surrogate value for labor.  Deciding which data would suffice for this purpose required

the agency to make a series of choices.  First, Commerce decided that it would rely on

earnings or wages data reported to the International Labor Organization ("ILO").[2]  Id. at

3.  Second, Commerce decided to prefer industry-specific data over data that did not

reflect the different incomes associated with different types of work.  Id.  Thus, noting

that industry-specific wages and earnings data were available in "Chapter 5B: Wages in

Manufacturing" of the ILO Yearbook of Labor Statistics, Commerce decided to use

Chapter 5B as the wages and earnings data source.  Remand Results at 13; see also

LABORSTA, ILO Labor Statistics Database 1998-2010, available at

http://laborsta.ilo.org/applv8/data/c5e.html (last visited April 21, 2011).

 When countries report any type of industry-specific data to the ILO, including

the wages and earnings data of interest in this proceeding, they do so according to a

uniform code known as the ISIC.[3]  But there are different revisions of the ISIC code, and

_____

  [2] "Wages" refer to "direct wages and salaries", while "earnings" encompass both wages and "bonuses and gratuities."  Antidumping Methodologies in Proceedings Involving Non-Market Economies, 76 Fed. Reg. 9,544, 9,545 (Feb. 18, 2011).

  [3] The International Standard Industrial Classification of all Economic Activities ("ISIC code") is aptly named.  It is a uniform, periodically updated system for the classification of economic activity, not unlike what the Harmonized Tariff Schedule is for the classification of imported merchandise.  All economic activities are divided into "Sections."  For instance, Section D covers all manufacturing.  Sections are separated into "Divisions," which are identified by a two-digit number.  Divisions are further separated into three-digit "Groups" or four-digit "Classes."  See http://unstats.un.org/ unsd/cr/registry/regcst.asp?Cl=2&Lg=1 (last visited April 21, 2011).  In the Wage Rate Memo and the Remand Results, Commerce refers to two-digit Divisions interchangeably as "Sub-Classifications" and "Classifications."  For consistency, the

not all countries report industry-specific data under the same revision.  Thus,

Commerce faced a third choice, to determine which revision of the ISIC code it

preferred.  No countries had reported data under the most recent revision of the code,

ISIC-Rev.4 , but many countries had reported data under ISIC-Rev.3.  Wage Rate Memo

at 3.  Moreover, many countries reporting under ISIC-Rev.3 had provided specific

wages and earnings data for Division 36, which covers "[m]anufacture of furniture;

manufacturing not elsewhere classified ("n.e.c.")," and encompasses pencil

manufacturing, which is explicitly included in Class 3699 "Other manufacturing n.e.c."

ISIC Rev.3 Class 3699, available at http://unstats.un.org/unsd/cr/registry/

regcs.asp?Cl=2&Lg=1&Co=3699 (last visited April 21, 2011).  Id.  Commerce did not

address in the Wage Rate Memo or in the Remand Results whether any countries

reported data under ISIC-Rev.2, or if so, whether those countries had reported data for

a 2-digit Division under that revision that might also include pencil manufacturing.

This series of decisions left Commerce with 10 countries that, in the agency's view,

satisfied the dual requirements of 19 U.S.C. § 1677b(c)(4), and that had reported

adequate industry-specific wages and earnings data for use in this case.[4]  Id. at 4.

---

Court will identify all groupings within the ISIC code by the formal nomenclature.

[4] Confusingly, the Wage Rate Memo identifies 11 countries that supposedly reported adequate data and meet the dual requirements of 19 U.S.C. § 1677b(c)(4), before noting that one of those countries, Armenia, did not meet the dual requirements because it was not a significant producer of comparable merchandise.  Wage Rate

Finally, Commerce filtered and, in some cases, adjusted the data provided by these 10 countries, in order "to arrive at a single earnings or wage rate for each country." Id. at 4-5.  First, the agency prioritized the use of earnings data when available, and wages data when not.  Id. at 5.  Second, the agency only considered data with combined male and female coverage.  Id.  Third, the agency used earnings or wages data most contemporaneous to 2007; if it had to use data from an earlier year, the agency inflated it with the use of the relevant Consumer Price Index to approximate 2007 price levels.  Id.  Fourth, Commerce "selected from the following categories [of workers], in the following hierarchy: 1) wage earners; 2) employees; 3) salaried employees; and 4) total employment."  Id.  Finally, Commerce chose hourly data where available; if a country reported data only on a daily, weekly, or monthly basis, the agency converted that data to an hourly figure assuming "8 working hours per day, 5.5 working days a week, and 24 working days per month."  Id.   After massaging the data in accordance to the foregoing parameters, Commerce calculated a final simple average industry-specific wage rate of $0.97 per hour.  Id.

Well, it was almost final.  Before issuing the Remand Results, Commerce noticed that three of the countries it had included in the final group of 10 (because they met the dual requirements of § 1677b(c)(4), and had provided all relevant data in the right ISIC

Memo at 4.

code revision) were nonmarket economies.  <u>Analysis Memorandum</u>, December 6, 2010

(AR 2753) at 3.  Because the surrogate value for labor in an NME proceeding cannot be

based on labor values from other nonmarket economies, Commerce reduced the final

group to seven countries, with a simple average wage rate of $1.07/hour.[5]

## B.       Shandong's Contentions

Shandong's primary argument is that Commerce should have only used wage

data from India, rather than from a basket of countries, to value labor as a factor of

production.  (Pl.'s Cmts. 4-20.)  Plaintiff argues that by valuing labor from a group of

countries, while valuing all other factors of production from a single surrogate country,

"Commerce has acted in an arbitrary and capricious manner."  (<u>Id.</u> at 6.)  Plaintiff cites

19 C.F.R. § 351.408(c)(2) and claims that "Commerce has a clear policy of obtaining as

many surrogate values from <u>a single</u> country as possible."  (<u>Id.</u> at 12 (emphasis in

original).)  What Plaintiff does not acknowledge, however, is that this regulation

explicitly identifies labor as an exception to the "normal" approach.  19 C.F.R. §

351.408(c)(2) ("Except for labor, [Commerce] normally will value all factors in a single

surrogate country.")

---

[5] In preparing the Remand Results, Commerce rewrote the process described in
the <u>Wage Rate Memo</u>, eliminating nonmarket economies from the initial group of
economically comparable countries, and accordingly diminishing the number of
countries left at each subsequent stage of the process.  <u>Remand Results</u> 11-14.

While Shandong's only explicit argument is that Commerce was required to use labor data from one country (India) rather than a group of countries, there are portions of its brief which might be read to argue in the alternative that even if using a basket of countries to value labor was permitted, the omission of Indian data from such a basket was unlawful.  For instance, Plaintiff suggests that the only reason Indian wage and earnings data from the ILO were not chosen by Commerce is that India had reported its data under ISIC-Rev.2, rather than ISIC-Rev.3.  (Pl.'s Cmts. at 6.)  Plaintiff argues that Commerce did not identify any reason why the Indian data was "intrinsically unreliable and arbitrary," and asserts that Indian ILO data is at least as reliable as the data chosen by Commerce.  (Id. at 6-7.)  Plaintiff highlights Commerce's data standards of "quality, specificity, and contemporaneity," arguing that the agency failed to apply these tests "to the seven countries and India equally."  (Id. at 9.)  Shandong points out that the Indian ILO data is available for a 3-digit Section (390), which is arguably more specific to the pencil industry than the 2-digit Divisions utilized by Commerce from the other countries.  (Id. at 13.)  Also, Shandong points out that the Indian ILO data comes from 2006, nearly contemporaneous with the period of review, whereas data from several of the countries used by Commerce were several years older, and required the use of inflators to approximate period of review levels.  (Id. at 14.)

Shandong's other major dispute with the Remand Results is on the issue of

which countries constitute "significant producers of comparable merchandise" within

the meaning of 19 U.S.C. § 1677b(c)(4)(B).  (Id. at 20.)  Plaintiff argues that Commerce's

interpretation of the term "significant producers" to include any country with any

quantity of exports in the relevant time period is an impermissible construction of the

statute.  (Id. at 21.)  Plaintiff states that for Commerce "to conclude that any country that

registers exports of a product, no matter how commercially inconsequential, represents

a 'significant producer' of that product . . . simply cannot withstand any real scrutiny."

(Id. at 21.)  Plaintiff points to the fact that the share of world trade held by many of the

countries Commerce deemed "significant producers" is astonishingly minuscule,

including, for instance, .00266% for Ukraine, .00356% for Ecuador, and .00756% for

Egypt.  (Id. at 22.)  Plaintiff also notes that according to the statute's legislative history,

"the term 'significant producer' includes any country that is a significant net exporter,"

(quoting Conference Report to the 1988 Omnibus Trade & Competitiveness Act, H.R.

Rep. No. 100-576, at 590 (1988)), and points out that Commerce "has previously relied

on countries being a net exporter in order to qualify as a significant producer," (citing

Certain Non-Forzen Apple Juice Concentrate from the People's Republic of China, 69

Fed. Reg. 65, 148 (Nov. 10, 2004) and accompanying Issues and Decision Memo).  (Id. at

24.)

C.      **Defendant's Response**

Defendant responds to Shandong's first argument by maintaining that

Commerce's reliance on data from multiple countries to produce a surrogate value for

labor is supported by substantial evidence on the record and is otherwise in accordance

with law.  (Def.'s Resp. to Remand Cmts. by Pl. Shandong Rongxin Import & Export Co.

Ltd ("Def.'s Resp.") 5-12.)  Defendant points to the record evidence, which demonstrates

wide variability of wages among countries with relatively comparable gross national

income, and notes that Commerce cited several characteristics which distinguish labor

from other production inputs.  (Id. at 7.)  Defendant highlights that Shandong's position

that Commerce must use a single country to value labor is explicitly contradicted by

statute, regulation, and CAFC case law.  (Id. at 8–9 (citing 19 U.S.C. § 1677b(c)(4), 19

C.F.R. § 351.408(c)(2), and Dorbest Ltd. v. United States, 604 F.3d 1363, 1372 (Fed. Cir.

2010)).)  Defendant concludes by dismantling Shandong's remaining arguments as to

why Commerce should have exclusively relied on Indian wage data.  (Id. at 9-12.)

Picking up on Shandong's possible argument that Indian labor data should have been

included with the basket of countries Commerce utilized, Defendant merely reiterates

that Commerce did not want to "mix and match data that can cover different industry

groupings from different ISIC Revisions."  (Id. at 15 (internal quotation and bracketing

omitted).)

The United States also defends Commerce's view that a country is a "significant

producer" if it exports any quantity of comparable merchandise in the relevant period.

(Id. at 12-16.)  Arguing under a Chevron framework, Defendant asserts that the term

"significant producer" is ambiguous and undefined in the statute.  (Id. at 13 (citing

Chevron U.S.A., Inc. v. National Resources Defense Council, Inc., 467 U.S. 837 (1984)).)

Defendant's view is that the legislative history is unhelpful, because it only indicates

that the term "significant producer includes" a net exporter, but offers no specific metric

or definition.  (Id. (emphasis added and internal quotation omitted).)  Thus, moving to

the second prong of Chevron, Defendant asserts that Commerce is entitled to

substantial deference.  Defendant explains that Commerce's motivation for defining

"significant producer" in this way was "to maximize the size of the ultimate basket of

countries for data purposes while still accounting for this criterion."  (Id. at 14.)  But,

pointedly, Defendant does not explain how treating a country with any quantity of

exports actually accounts for this criterion.

**D.    Analysis**

The Court finds groundless Shandong's argument that Commerce was obligated

to utilize data from a single country to value labor.  This argument is untenable in the

face of a statute, agency regulation, and CAFC case law which all explicitly permit the

agency to utilize data from multiple countries.  19 U.S.C. § 1677b(c)(4) (instructing

Commerce to "utilize, to the extent possible, the prices or costs of factors of production

in <u>one or more market economy countries</u>") (emphasis added); 19 C.F.R. § 351.408(c)(2)

(explicitly excepting labor from Commerce's normal approach of valuing factors of

production in a single surrogate country); <u>and</u> <u>Dorbest</u>, 604 F.3d at 1372 (describing a

possible "subset of . . . countries" that would satisfy the dual requirements of

§1677b(c)(4)).  Additionally, Commerce is well justified in averaging wage rates to

produce a single surrogate value, with record evidence establishing both the existence

of variation in wages among similarly economically developed countries, and the

reasons for it.  (<u>See</u> Remand Results at 10–11 (<u>citing</u> <u>International Labor Organization,</u>

<u>Global Wage Report: 2009 Update</u>, (2009) at 5, 7, and 10.)  Commerce is therefore acting

reasonably when it treats labor differently from other factors of production.

Accordingly, Commerce's decision to utilize data from multiple countries is supported

by substantial evidence on the record, and is otherwise in accordance with law.

        The Court is less sanguine, however, about the reasons Commerce cites for

excluding Indian labor data, which was reported under ISIC-Rev.2, from the group of

countries ultimately providing the labor rate, all of which reported data under ISIC-

Rev.3.  While the agency has made clear that it prefers "to use data from a single ISIC

revision to ensure consistency of the industry category," the Court finds Commerce's

justification for this preference lacking and inconsistent.  The Indian wages and earnings

data reported to the ILO appears to meet all other criteria identified by the agency,

including quality, specificity, and contemporaneity.  Indian ILO labor data was reported

for a year close to the period of review—2006—and was reported at a more specific 3-

digit level of the ISIC than the 2-digit-level data relied on by Commerce.  Also, India

reported a combined earnings figure for men and women, in accordance with

Commerce's preference, and the agency does not dispute that the ISIC-Rev. 2 Indian

labor data includes the pencil industry.  To dismiss such apparently valuable data

without further explanation is unjustified.  Moreover, refusing to use ISIC-Rev.2 data

contradicts what the agency has repeatedly identified as a paramount interest:

generating the broadest basket of countries possible to value labor.  Commerce has cited

the need for a broad basket of countries to justify using less contemporaneous data,

Remand Results at 28, and to attempt to justify the inclusion of labor data from

countries with minuscule amounts of exports, (Def.'s Resp. at 14.).  The inconsistency

with which Commerce has asserted the need for a broad basket of countries warrants a

remand.

Commerce has broad discretion to determine which criteria it will use to sort and

prioritize the data it uses in making its determination.  The Court's role is to ensure that

Commerce's sorting and prioritizing decisions are reasonable and consistently applied.

In this case, the Court finds that most of Commerce's sorting and prioritizing decisions

are well justified, such as the decision to use earnings data if available, and wages data

if not, and the choice only to utilize data reported for both sexes. The decision to insist

that data be reported under a common ISIC revision, however, is not supported by

substantial evidence on the record. On remand, if Commerce still wishes to omit all

labor data that a qualifying country reported under ISIC-Rev.2, it must explain why the

need for consistency across ISIC revisions predominates over the need for a broad

basket of countries to value labor. Alternatively, if Commerce determines that the chief

value is to have the broadest feasible basket of countries, Commerce is instructed to

review which qualifying countries have reported data under a prior ISIC revision which

satisfy the agency's other requirements.[6]

The final issue of concern for the Court is Commerce's construal of the term

"significant producer" to mean any country with any level of exports under the relevant

HTS subheading. See Remand Results at 20. Commerce's justification for this is pure

speculation: the agency claims that "a country's ability to export comparable

---

[6] For instance, the Court notes that Nicaragua, a country Commerce identified as
an economically comparable significant producer of comparable merchandise, reported
hourly, male- and female-employee earnings data in 2006 for Division 39 of ISIC Rev.2.
See http://laborsta.ilo.org (select wages, follow Main statistics (annual); on following
page select country Nicaragua, select first year 2002, select last year 2007, select table 5B
Wages in manufacturing; press "Go!", then select view) (last visited April 21, 2011). If
Commerce determined that such data comported with the agency's other requirements,
including it would broaden the basket of countries that Commerce can utilize to value
labor.

merchandise is indicative of substantial production because it is likely producing

merchandise at a level that surpasses its internal consumption."  Id.  There is nothing on

the record to support this theory—no evidence about domestic pencil manufacturing in

these countries, nor even any evidence about the level of imports of comparable

merchandise for comparison purposes.  While the inference that exports implies

significant domestic production is somewhat palatable in the case of a country such as

Indonesia, which had between $40 million and $53 million of exports in each year

between 2005 and 2007, it is increasingly absurd and implausible as the quantity of

exports in any given country approaches zero.  In fact, many of the economically

comparable countries that Commerce identified as "significant producers" had little or

no exports in the years in question.  For instance, Maldives had $67 of exports in 2005,

and no exports in 2006 or 2007, and yet was considered a significant producer.  Wage

Rate Memo at Attachment 2.  Similarly, Cape Verde and Swaziland were considered

significant producers despite never exporting more than $159 and $218 of pencils,

respectively, in any year between 2005 and 2007.  Id.  The idea that Guyana, which

exported a total of $43 of pencils between 2005 and 2007, is a "significant producer" that

manufactured $43 of pencils more than domestic consumption for that period is

imaginative, but wholly unsupported.  Ultimately, wage rates from Maldives, Cape

Verde, Swaziland, Guyana and other countries with similarly low levels of exports were

not included in Commerce's final labor calculation because these countries failed to

report relevant labor data to the ILO.  That coincidence, however, does not cure the

ailment arising from Commerce's absurd construction of the term "significant

producer."

   The term "significant" in 19 U.S.C. § 1677b(c)(4) is not statutorily defined, and is

inherently ambiguous.  Significant has among its definitions "having meaning" and

"having or likely to have influence or effect."  Webster's Third New International

Dictionary 2116 (1993).  Because the term is ambiguous, Commerce is entitled to broad

deference in its construal of the term, and the Court's question "is whether

[Commerce's] answer is based on a permissible construction of the statute."  Chevron,

467 U.S. at 842-43.  Commerce's interpretation of "significant" encompasses countries

which almost certainly have no domestic production—at least not any meaningful

production, capable of having influence or effect—and is therefore an impermissible

construction of 19 U.S.C. § 1677b(c)(4).  On remand, if Commerce wishes to continue to

rely on export statistics as a proxy for significant production, it must include some

additional mechanism to ensure that it does not propagate the fiction that countries

with a few dollars of exports are engaged in significant production.  Alternatively,

Commerce is free to adopt an altogether different approach to identifying significant

production.

## Conclusion

In conclusion, for the reasons stated herein, the Court affirms Commerce's decision to rely on data from multiple countries to value labor as a factor of production pursuant to 19 U.S.C. § 1677b(c), and it is hereby

**ORDERED** that this case is remanded to Commerce, and it is further

**ORDERED** that Commerce must reevaluate, in accordance with this opinion, the decision to omit labor data simply because it was reported under a previous revision of the ISIC, and it is further

**ORDERED** that Commerce must modify, in accordance with this opinion, the way in which it determines whether a country is a significant producer of comparable merchandise within the meaning of 19 U.S.C. § 1677b(c)(4), and it is further

**ORDERED** that Commerce must provide the results of its redetermination pursuant to remand to the Court no later than **June 21, 2011**, and it is further

**ORDERED** that Plaintiff shall file its comments on the remand results no later than **June 28, 2011**, and it is further

**ORDERED** that Defendant shall file any responses to Plaintiffs comments no later than **July 6, 2011**.

  /s/ Gregory W. Carman
Gregory W. Carman, Judge

Dated:        April 21, 2011
              New York, NY